IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THOMAS D. SCOTT,<br><br>Plaintiff, | ORDER AFFIRMING<br>COMMISSIONER'S DECISION |
| vs. | |
| MICHAEL J. ASTRUE, Commissioner of the<br>Social Security Administration,<br><br>Defendant. | Case No. 2:06-CV-00833 PGC<br><br>Judge Paul G. Cassell |

The plaintiff, Mr. Thomas Scott, brings this action for the court to review the Social Security Administration Commissioner's denial of his application for disability and social security insurance benefits under Title II of the Social Security Act.[1]  Mr. Scott argues the administrative law judge (ALJ) based his credibility determinations regarding Mr. Scott's daily activities on improper grounds.  Mr. Scott also claims the ALJ failed to properly consider whether his injuries and conditions qualified as a "Listing" under the Listing of Impairments.[2]

---

[1] 42 U.S.C. § 405(g).

[2] 20 C.F.R. § 404.1520(d).

Finally, Mr. Scott argues the ALJ did not follow the correct procedure in determining whether Mr. Scott adequately complied with prescribed treatment.

The Commissioner counters that the ALJ legitimately considered Mr. Scott's daily activities in the determining whether they were inconsistent with both his self-assessment and ability to perform sedentary work. The Commissioner also argues that, after a review of objective, relevant medical sources, the ALJ properly found Mr. Scott's impairments did not meet or equal a listed impairment. Finally, the Commissioner maintains that, in determining Mr. Scott retained the residual functional capacity to perform a range of sedentary work, the ALJ was not required to apply a factored analysis as alleged by Mr. Scott.

The court finds the ALJ applied the correct legal standards and substantial evidence supports his decision to deny Mr. Scott disability and social security insurance benefits. Therefore, the court affirms the Commissioner's decision and denies Mr. Scott's motion.

## FACTS AND FINDINGS

For purposes of this appeal, the court finds the following facts.

1.    *General Background*

On April 21, 2005, the date of the ALJ's final decision, Mr. Scott was forty-eight years old. He had completed the eleventh grade and received his GED certificate. By way of past work history, Mr. Scott has held positions as an equipment operator, gas station attendant, carpenter, cement worker, load operator, and a variety of other labor-intensive positions.

In May 2001, Mr. Scott filed an application for social security benefits, alleging that he was rendered disabled and unable to work as a result of a back injury sustained while working in

1997.  Diagnostic studies revealed disc herniations with significant impingement of the spinal cord.  The studies also revealed degenerative disc disease with modest bulging and significant disc protrusion.  Mr. Scott underwent cervical diskectomies and fusions in an effort to resolve his pain and associated impairments.  Ultimately, the ALJ denied Mr. Scott's application for benefits, and Mr. Scott filed a request for review by the Appeals Council, which was also denied. Mr. Scott did not appeal that ruling.  The ALJ issued the decision on March 20, 2003.

Mr. Scott then filed a second application for benefits on May 27, 2003, alleging a disability onset date of September 29, 2001 — this application is at issue here.  Mr. Scott attended a hearing for the second application on December 14, 2004, but made no request to reopen the prior claim during this hearing.  As a result of the prior ruling denying benefits, Mr. Scott's counsel amended the alleged disability date for purposes of his second application to March 21, 2003.  Although Mr. Scott includes a lengthy and substantive review of his injuries and impairments dating back to 1997, much of that history is outside the disability period and will not be addressed here.

The first relevant treatment date within the alleged disability time frame is April 2003, at which time Mr. Scott was treated by Dr. Craig Grose.  Dr. Grose recorded Mr. Scott's complaints of chronic neck and lumbar spine pain, and numbness and tingling down both arms and both legs intermittently.  Dr. Grose's objective findings included weakness in Mr. Scott's arms which precluded any lifting above the shoulders.  Dr. Grose noted that Mr. Scott was unable to hold his arms against gravity and that he had extreme weakness in his legs, prohibiting him from raising his legs more than ten inches off the ground.  Nevertheless, Dr. Grose also noted that Mr. Scott

retained good reflexes and feeling in his arms and appeared to have no muscle wasting.  In the

end, Dr. Grose stated that in his opinion as a non-disability specialist, he believed any gainful

employment requiring physical activity was unlikely.

Dr. R. Burkett of Utah Disability Determination Services (DDS) evaluated Mr. Scott in

August 2003.  Dr. Burkett's report summarized much of Mr. Scott's medical history (including

the April 15, 2003 report from Dr. Grose) finding weakness in Mr. Scott's arms and legs, due to

pain.  Dr. Burkett concluded Mr. Scott could lift and/or carry ten pounds occasionally and less

than ten pounds frequently; stand and/or walk (with normal breaks) for a total of at least two

hours in an eight-hour day; sit (with normal breaks) for a total of about six hours in an eight-hour

day; and had an unlimited ability to push and/or pull (including operation of hand and/or foot

controls).

Additionally, Dr. Burkett noted there was "documentation" of Mr. Scott's chronic

depression.  The documentation Dr. Burkett referred to arose from Mr. Scott's July 31, 2003,

psychological examination by Elizabeth Allen, PhD.  At this visit, Mr. Scott stated he was angry

due to his medical and physical condition and inability to work.  Dr. Allen found that Mr. Scott

suffered from mild depressive symptoms.  However, during his review of these records, Dr.

Burkett concluded that Mr. Scott did not have a medically-determinable mental impairment.

Finally, Dr. Burkett found Mr. Scott only partially credible, stating that his subjective

symptoms appeared to be out of proportion with objective, medical findings. Dr. Burkett also

found Mr. Scott's activities of daily living (ADLs) to be consistent with sedentary work, at least,

and possibly even light work.  Nevertheless, Dr. Burkett gave Mr. Scott "the benefit of the

doubt" and assigned him only a sedentary residual functional capacity.[3]

In late August 2003, Mr. Scott filed an application with the Utah State Office of Rehabilitation requesting access to training programs and other services. On September 3, 2003, a counselor from this office responded and informed Mr. Scott that due to his health issues, lack of feeling and chronic pain, vocational training would not be feasible and that immediate employment opportunities were unrealistic.

On September 9, 2003, Mr. Scott once again visited Dr. Grose for treatment related to back pain, peripheral numbness, tingling, and pain in his hands and feet. Dr. Grose's diagnoses included chronic back and peripheral neuropathy. Dr. Grose also noted that Mr. Scott was well-nourished and appeared to be in moderate distress. Nonetheless, Dr. Grose found Mr. Scott had good strength in all extremities, but felt some pain with palpation in his thoracic and lumbar spine. Dr. Grose also ruled out a diagnosis of diabetes. Dr. Grose started Mr. Scott on methadone twice daily in an effort to better control Mr. Scott's pain symptoms and also ordered a nerve conduction study.

Mr. Scott saw Dr. Grose again on September 19, 2003, for continued back pain. Although Dr. Grose noted Mr. Scott's arms and legs had very good reflexes without significant atrophy, Dr. Grose doubled Mr. Scott's methadone prescription. Dr. Grose noted that Mr. Scott complained that the methadone caused mild sedation.

Dr. David Johnson performed the nerve conduction study prescribed by Dr. Grose on

---

[3] R. 372

October 6, 2003.  The study revealed bilateral moderate median nerve compromise of the wrist, but there was no evidence of ulnar nerve compromise, thoracic outlet syndrome, cervical radiculopathic processes, polyneuropathic processes, or peripheral entrapment of the peroneal or tibial nerves.  Dr. Grose, after reviewing this study, opined on October 22, 2003, that the results and symptoms may be consistent with a central nervous system source or interpretation of pain.

Dr. Dennis Taggart, a State agency physician, preformed a review of Dr. Burkett's evaluation and of Mr. Scott's medical history, records, and condition on January 7, 2004. At this time, Dr. Taggart affirmed Dr. Burkett's review and recommendations, one of which was that Mr. Scott could likely perform a limited range of sedentary work.

On May 7, 2004, Dr. Grose wrote a "To Whom It May Concern" letter stating that Mr. Scott was suffering from ongoing lumbar and cervical back pain with an inability to do physical labor.  Dr. Grose also explained Mr. Scott's methadone and amitriptyline regime and that, because of his limited income, Mr. Scott had difficulty refilling his prescriptions.

On November 29, 2004, Mr. Scott completed a Self-Assessment of Physical Capabilities form.  At that time, Mr. Scott indicated he could sit for four to five hours per day for forty-five minutes at a time, stand one to two hours per day for fifteen minutes at a time, and walk one to two hours per day for fifteen minutes at a time, but that he needed to lie down one to two hours a day for at least one hour at a time.  Mr. Scott also indicated he could occasionally carry five pounds, rarely carry ten pounds, and never carry more than twenty pounds.  He further indicated he could use both his hands/fingers/arms (upper extremities) for simple grasping (with a weak grip), both his upper extremities for pushing and pulling (only rarely and with pain), and both his

upper extremities for fine manipulation (but very little).

Then, on December 6, 2004, Dr. Grose completed a Treating Physician's Physical RFC Report on Mr. Scott's behalf. Dr. Gross indicated that he had been treating Mr. Scott since 1980, and had treated Mr. Scott approximately every three months since June 2002 for his injuries. Dr. Grose opined that Mr. Scott's prognosis for full recovery was poor. Dr. Grose's report also indicated that Mr. Scott suffered from chronic pain in his shoulders, back, and hips, which worsened with activity. Additionally, Dr. Grose found Mr. Scott suffered from a peripheral loss of strength but was still functional and had good reflexes. Dr. Grose stated that the methadone continued to cause sedation.

Further, Dr. Grose noted that although Mr. Scott might be capable of working in a low-stress environment, Mr. Scott could not walk one city block or more without rest or severe pain, could not walk one block or more on uneven ground, and could not routinely walk up and down stairs without difficulty. Dr. Grose opined Mr. Scott's pain would "constantly" interfere with his attention and concentration while working. He determined Mr. Scott would need to lie down one hour at a time and would require three, unscheduled breaks of thirty to sixty minutes per break, per day. Also, Dr. Gross concluded Mr. Scott could sit forty-five minutes at a time, stand for forty-five minutes at a time, and walk for forty-five minutes at a time; could sit and stand/walk for a total of less than two hours in an eight-hour work day; and must use a cane or other assistive device when he stands and walks.

As to his exertional ability, Dr. Grose noted that Mr. Scott could occasionally lift and carry less than ten pounds, rarely lift and carry ten pounds, and never lift and carry twenty pounds

or more.  Mr. Scott could also frequently look down, turn his head right or left, hold his head in a static position; occasionally look up; rarely stoop/bend, crouch/squat, climb ladders or climb stairs; and never twist.  Dr. Grose also noted significant limitations with Mr. Scott's reaching, handling, or fingering.  Mr. Scott could use his hands to grasp, turn, and twist objects as well as use his fingers in fine manipulation twenty-five percent of the time, and use his arms for reaching, including overhead, only ten percent of the time.

Based on his overall findings, Dr. Grose found that Mr. Scott would be off-task about thirty percent of the time, would be absent from work more than six days per month, and Mr. Scott's ability to work on a sustained basis was twenty percent that of an average worker.

2.      *Benefits Hearing and Mr. Scott's Appeal*

Mr. Scott filed an application for social security and disability insurance benefits (DIB) on May 27, 2003, alleging a disability period beginning September 29, 2001.  However, the Social Security Commissioner denied Mr. Scott's previous disability application on March 20, 2003.  Therefore, the alleged onset date of Mr. Scott's disability was amended, through counsel, to March 21, 2003.   Mr. Scott requested and was granted a hearing before an ALJ.  The hearing was held on December 14, 2004, in St. George, Utah, before ALJ Rand Farrer.  The ALJ issued a decision on April 21, 2005, finding that Mr. Scott was not disabled for social security purposes. The Appeals Council declined Mr. Scott's request for review on July 25, 2006, so the ALJ's decision became final.

At the hearing, Mr. Scott testified to his medical and physical condition, describing his medical history.  Specifically, Mr. Scott testified about his two spinal fusion surgeries in 2000.

He testified that his physician had not yet released him back to work and that his phyisician had told him that his condition was not likely to improve.  Even though Mr. Scott's medical records indicated he had good reflexes and no muscle wasting, Mr. Scott testified that since his prior application his pain was more frequent, lasted longer, and went further down his legs than before.  Mr. Scott claimed an inability to spend much time sitting or standing.  Also, he testified to being more unsteady on his feet and explained he had started dropping things more often due to numbness in his hands.

Mr. Scott testified that he is able to sit for about twenty to thirty minutes on average before he has to stand due to pain or discomfort and is able to stand for about fifteen to twenty minutes.  After standing for about fifteen to twenty minutes, Mr. Scott testified, he can then sit again and the pain subsides a little bit.  But Mr. Scott explained he must use a cane to prevent falling and that he has used a cane for about five years.  Mr. Scott also testified that his condition and inability to work caused depression, for which he takes Zoloft.

Following Mr. Scott's testimony, his long-time girlfriend, Marilyn Roberts, also testified as to Mr. Scott's condition.  Ms. Roberts testified that she had known Mr. Scott for about sixteen years and had lived with him for about fifteen years.  She testified that Mr. Scott is limited in his activities.  For instance, he needs help getting out of bed, getting dressed in the morning, and putting on his shoes.  Ms. Roberts also stated that Mr. Scott stumbles around the house a lot and sometimes drops and breaks dishes due to numbness in his hands.  Finally, Ms. Roberts testified that Mr. Scott suffers from pain in his arms and legs, has difficulty sitting for long periods of time, and has difficulty sleeping.  She explained that Mr. Scott passes time on a computer.

After Mr. Scott and Ms. Roberts testified, the ALJ heard testimony from Kenneth Lister, a vocational expert. Prior to testifying, Mr. Lister had reviewed the exhibits relating to Mr. Scott's past work and listened to Mr. Scott's testimony. In his testimony, Mr. Lister identified Mr. Scott's past relevant work positions and testified to the transferrable skills Mr. Scott acquired in those positions. Also, the ALJ requested Mr. Lister to work through several hypothetical situations relating to an individual's ability to perform work when faced with certain limitations.

Specifically, the ALJ asked Mr. Lister to assess the work capacity of an individual of Mr. Scott's age, education, and work experience in light of the following hypothetical:

> Lifting would be limited to ten pounds. . . The standing and walking–standing and walking would be two hours total. Sitting would be in forty-five minute increments for up to six hours. The individual would need to lie down one hour during the work day as part of the morning and afternoon breaks, and part of the lunch period. The individual would miss up to, but not more than twenty-four days of work per year. And the only–the, the following would be able to be accomplished only on an occasional basis, climbing, balancing, stooping, kneeling, crouching, or crawling. And the individual should avoid ladders, ropes, or scaffolds. And also should avoid hazardous work environment.[4]

Mr. Lister testified that an individual with such limitations would not be able to work on a full-time, sustained basis in any of Mr. Scott's past relevant work positions. Mr. Lister did testify, however, that there was some limited transferability of skills which made Mr. Scott eligible for unskilled, sedentary work. Mr. Lister identified charge account clerk, semiconductor clerk, and telephone quotation clerk as available jobs for a person with Mr. Scott's limitations

---

[4] R. 493–94.

and retained skills.  Mr. Lister classified each of these jobs in the low-to-medium stress category.

In response to further questioning, Mr. Lister testified that if the individual could only use his

hands for frequent repetitive movements half of the day, available jobs would decrease by as

much as thirty percent.  Additionally, if the individual had to use a cane, available jobs would be

limited by another five percent.  Lastly, Mr. Lister stated that if the individual had the limitations

described by Dr. Grose, the individual would be eliminated from all possible jobs.

On April 21, 2005, the ALJ issued a decision on Mr. Scott's disability and social security

claims.  Using the five-step sequential evaluation process,[5] the ALJ found Mr. Scott suffered

from a severe impairment, but he was not disabled for purposes of Social Security Act.  The ALJ

concluded that even with his limitations, Mr. Scott could perform work existing in significant

numbers in the national economy.

Specifically, at step one, the ALJ found Mr. Scott had not engaged in any substantial

gainful activity subsequent to the alleged date of onset.  At step two, the ALJ found that the

objective medical evidence established that Mr. Scott had medically-determinable severe

impairments of gastroesophageal reflux disease, Bell's Palsy, mild obesity, moderate median-

nerve compromise bilaterally and status-post spinal fusions.  At step three, the ALJ concluded

Mr. Scott's severe impairments, alone or in combination, failed to meet or equal any impairment

in the Listing of Impairments under Appendix 1 of the regulations.[6]  Specifically, the ALJ found

---

[5] *See* 20 C.F.R. § 404.1520; *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

[6] *See* 20 C.F.R. § 404.1520(d).

that Mr. Scott's spinal fusions and resulting condition failed to meet or equal Listings § 1.04 or §

11.14, or any other impairments in the Listings.

At step four, the ALJ analyzed Mr. Scott's residual functional capacity and determined

that Mr. Scott could not perform any of his prior relevant work.  Also, the ALJ found Mr. Scott

not fully credible based on the objective evidence which did not support Mr. Scott's subjective

complaints and alleged functional limitations.  The ALJ ultimately found Mr. Scott had the

residual functional capacity to sit forty-five minutes at one time and six hours per eight-hour

work day; lift, carry, and perform postural activities "occasionally," with no repetitive use of his

hands four hours per eight-hour workday; be exposed to no hazardous conditions such as moving

mechanical parts or heights; and work in low to moderate stress environments.  The ALJ also

determined Mr. Scott would need to lie down for one hour during an eight-hour workday.

Finally, the ALJ concluded Mr. Scott would miss up to, but no more than, twenty-four days of

work a year due to his impairments and limitations.

At step five, based upon the testimony of a vocational expert, the ALJ determined Mr.

Scott could perform work that existed in significant numbers in the national economy.

Therefore, the ALJ found Mr. Scott to be not disabled within the meaning of the Social Security

Act.

Mr. Scott sought review of the ALJ's decision from the Appeals Council.  The Appeals

Council denied Mr. Scott's request for reconsideration and adopted the ALJ's decision as the

Commissioner's final decision.  Mr. Scott now brings this action, seeking judicial review of the

Commissioner's decision denying his application for social security and disability insurance

benefits.

## STANDARD OF REVIEW

The standard of review for social security challenges is set forth in 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."[7]   In other words, the court reviews the Commissioner's decision to ascertain whether it is supported by substantial evidence in the record and to evaluate whether the ALJ applied the correct legal standards.[8]   "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9]   The court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."[10]   However, the court does not "reweigh the evidence or substitute [its] judgment for the Commissioner's."[11]

## DISCUSSION

The court finds the ALJ's conclusions to be supported by substantial evidence and free from legal error.  The Social Security Administration is authorized to pay disability insurance

---

[7] 42 U.S.C. § 405(g).

[8] *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *see also Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

[9] *Grogan*, 399 F.3d at 1261.

[10] *Id.* at 1262.

[11] *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005).

benefits only to persons who have a "disability," as defined by the Social Security Act.  A person is disabled only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[12]

In order to determine whether a social security claimant is disabled, the Commissioner uses a five-step evaluation.[13]  The claimant bears the burden of proof for steps one through four, and if the claimant fails to meet this burden, consideration of any subsequent steps is rendered unnecessary.[14]  As the Tenth Circuit explained in *Fischer-Ross v. Barnhart*:[15]

> Step one requires a claimant to establish [he] is not engaged in "substantial gainful activity."  Step two requires the claimant to establish [he] has a "medically severe impairment or combination of impairments."  Step three asks whether any "medically severe impairment," alone or in combination with other impairments, is equivalent to any of a number of listed impairments so severe as to preclude "substantial gainful employment."  If listed, the impairment is conclusively presumed disabling.  If unlisted, the claimant must establish at step four that [his] impairment prevents [him] from performing work [he] has previously performed.  If the claimant is not considered disabled at step three, but has satisfied [his] burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of [his] age, education, and work experience.[16]

---

[12] 42 U.S.C. § 423(d)(2)(A).

[13] *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988).

[14] *Williams*, 844 F.2d at 750.

[15] 431 F.3d 729 (10th Cir. 2005).

[16] *Id*. at 731 (citations omitted).

In this case, the ALJ denied Mr. Scott's claim at step five, finding that while he had a severe impairment, he was able to perform work existing in significant numbers in the national economy.  Specifically, the ALJ first found Mr. Scott's residual functional capacity to include various severe limitations but concluded his injuries did not amount to a Listings impairment. The ALJ also noted Mr. Scott's limitations with respect to standing, walking, and lifting for extended periods, in addition to Mr. Scott's inability to perform repetitive hand movements.  But these limitations, according to the ALJ, would not prevent Mr. Scott from performing work as a charge account clerk, semiconductor bonder, or telephone quotation clerk.

Mr. Scott does not dispute the ALJ's findings as to step one, two, and four.  Rather, Mr. Scott claims the ALJ improperly found that Mr. Scott's condition did not meet a Listings impairment and that the ALJ's findings at step five are tainted by legal error.  Mr. Scott makes three specific arguments to support these claims: (1) that the ALJ's credibility finding was not proper; (2) the ALJ failed to take into account evidence of Mr. Scott's surgeon, Dr. Bacon, stating that his condition qualified as an impairment; and (3) the ALJ did not conduct the proper analysis in evaluating Mr. Scott's compliance with treatment and the effect of such on his ability to work.  The Commissioner counters that the ALJ decided properly.  A review of the record and the ALJ's decision reveals the ALJ's findings are supported by substantial evidence in the record. The court addresses each claim of error in turn.

1.      *The ALJ's Credibility Assessment*

Mr. Scott argues the ALJ's credibility assessment is flawed, constituting legal error. Specifically, Mr. Scott argues that the ALJ used improper evidence, such as ability to perform

light household chores and other minimal daily activities to discount Mr. Scott's claims of disability.  The court finds the ALJ considered proper evidence.

Courts give great deference to an ALJ's conclusions regarding a claimant's credibility because determinations of credibility are based on observations made by the ALJ as the trier of fact.[17]  Therefore, the ALJ's credibility determinations are generally considered binding on the reviewing court.[18]  Nevertheless, findings as to credibility should be closely linked to substantial evidence and not just conclusory.[19]  The Tenth Circuit has enumerated factors relevant to an ALJ's assessment of credibility; they are: (1) the levels of medications used by the claimant and their effectiveness, (2) the extensiveness of the claimant's attempts (medical or non-medical) to obtain relief, (3) the frequency of the claimant's medical contacts, (4) the nature of the claimant's daily activities, (5) subjective measures of credibility that are peculiarly within the judgment of the ALJ, (6) the motivation of and relationship between the claimant and other witnesses, and (7) the consistency or compatibility of non-medical testimony with objective medical evidence.[20]  Finally, an ALJ must set forth specific evidence upon which he relies in evaluating a claimant's

---

[17] *Campbell v. Bowen*, 822 F.2d 1518, 1522 (10th Cir. 1987) (citing *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983)).

[18] *See Broadbent*, 698 F.2d at 413–14; *Cooley v. Weinberger*, 518 F.2d 1151, 1155–56 (10th Cir. 1975).

[19] *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988).

[20] *Id.* at 1132.

credibility.[21]

Conversely, courts have enumerated factors an ALJ may not consider in assessing credibility. For example, the ability to engage in limited daily activities, alone, is not a sufficient basis for discounting a claimant's credibility.[22] In other words, *sporadic* performance of any activity does not establish that a person is able to engage in substantial gainful activity.[23]

However, an ALJ may properly consider such daily activities as long as they are not the sole basis for the credibility determination and as long as the daily activities correlate with workday activities in terms of actual functional ability, exertion, sustained performance, and regularity. In other words, an ALJ may evaluate a claimant's ability to perform "substantial services with reasonable regularity."[24] For example, in *White v. Barnhart*,[25] the Tenth Circuit affirmed an ALJ's unfavorable credibility determination that was based on the ALJ's "judgment on his review of the medical records as well as Ms. White's own account of her daily activities, finding both to be inconsistent with her complaints of disabling pain."[26]

In this case, while the ALJ did rely, in part, on Mr. Scott's ability to engage in limited

---

[21] *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000) (citing *Kepler v. Chater*, 68 F.3d 387, 390-91 (10th Cir. 1995)).

[22] *Hogg v. Shalala*, 45 F.3d 276, 279 (8th Cir. 1995); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

[23] *Frey v. Bowen*, 816 F.2d 508, 516–17 (10th Cir. 1987).

[24] *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989).

[25] 287 F.3d 903 (10th Cir. 2002).

[26] *Id.* at 909.

daily activities in support of his credibility determination, he also relied on other factors such as the medications Mr. Scott used and the evidence as a whole.  For instance, he found Mr. Scott's complaints of numbness and pain to be inconsistent with the objective medical evidence and the types of treatment Mr. Scott utilized to alleviate his pain.

With respect to Mr. Scott's daily activities, the ALJ's approach is proper because he evaluated Mr. Scott's daily activities as a whole, and in relation to an eight-hour workday.  The ALJ assessed Mr. Scott's ability to budget, drive, shop independently, make coffee, smoke cigarettes, walk around on the porch and yard, read, use his computer, wash dishes, do the laundry, watch television, and take classes online.  In the end, the ALJ reasoned that Mr. Scott's daily activities, when viewed cumulatively, are tantamount to an eight-hour day of sedentary work (with appropriate breaks as prescribed).  Specifically, the ALJ found "the claimant's general activity level as demonstrated in the record belies his alleged level of limited activity"[27] and that Mr. Scott's self-assessment of his own activities were "not significantly inconsistent with a range of [sedentary] work activity."[28]  Substantial evidence supports this finding. An ability to perform all these activities on a daily basis constitutes "substantial services with reasonable regularity,"[29] when viewed in relation to the requirements for sedentary work.

 In sum, the ALJ's credibility analysis was legally proper and was supported by legitimate

---

[27] R. 27

[28] R. 28

[29] *Thomas*, 876 F.2d at 669.

reasons and specific evidence, as required by law.

2.      *The ALJ's Listings Impairment Determination*.

Mr. Scott's next argument is that the ALJ committed legal error by not considering medical source treatment prior to March 2003, and by concluding that Mr. Scott's condition did not meet or equal a Listings impairment.  These arguments are without merit.

First, although a hearing examiner must "inquire fully into the matters at issue,"[30] he need not inquire into matters apparently unrelated to the claim.[31]  Thus, the ALJ was not required to discuss Dr. Bacon's report, as it fell outside the scope of the relevant disability period.  The parties stipulated to an alleged onset date of March 21, 2003, and Dr. Bacon's report was completed in June 2002.  Also, the doctrine of *res judicata* precludes a finding of disability prior to the date of denial of Plaintiff's previous application.  *Res judicata* applies when a prior denial of an application raising the same issues has become final because of the failure of the applicant to make a timely request for a hearing.[32]  Because Mr. Scott did not appeal the prior ruling of March 20, 2003, the prior decision of the ALJ became binding.  And the March 2003 decision decided the exact issue Mr. Scott asks this court to decide — whether Dr. Bacon's report supported a finding that Mr. Scott's condition met a Listing.  Because the first ALJ squarely addressed this issue, it was proper for the second ALJ to consider the matter resolved.

---

[30] 20 C.F.R. § 404.927.

[31] *Garcia v. Califano*, 625 F.2d 354, 356 (10th Cir. 1980).

[32] *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990); *see also Hunt v. Weinberger*, 527 F.2d 544, 548 (6th Cir. 1975).

Second, the ALJ sufficiently explained why the claimant's impairment did not meet or equal a Listings impairment.  In considering Mr. Scott's injuries, the ALJ considered a wide range of possible Listing impairments that might qualify Mr. Scott for disability benefits.  The ALJ discussed categories 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 1.04, 11.04, and 11.14.  Among these, the ALJ found § 1.04 the most applicable to Mr. Scott's condition.  To be "disabled" within the meaning of § 1.04, the claimant must suffer from compromise of a nerve root or the spinal cord with one of three accompanying set of conditions enumerated as subsections (A), (B), and (C).[33]  The ALJ immediately ruled out subsections (B) and (C) as qualifying subsections because the record was "bereft of any diagnoses of spinal arachnoiditis or pseudoclaudification" as required by subsections § 1.04 (B) and (C), respectively.[34]

Thus, for Mr. Scott's condition to meet or equal a Listings impairment, it must fall under subsection (A).  In other words, the objective medical evidence must prove "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."[35]  But the objective medical evidence showed no atrophy, sensory loss, muscle wasting, or reflex loss.  Therefore, a finding of disability was

---

[33] 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04.

[34] R. 23.

[35] *Id.*

precluded under subsection (A).  This finding also comports with the prior social security

adjudication in March 2003, where ALJ Donald Jensen found Mr. Scott to be not disabled.

Accordingly, this court finds the ALJ committed no legal error with regard to step three,

and his findings are supported by substantial evidence.

*3.*     *Mr. Scott's Compliance With Prescribed Treatment*

Mr. Scott's third and final argument is that the ALJ did not conduct a proper analysis of

Mr. Scott's compliance with treatment using the four factors identified in *Teter v. Heckler*.[36]  In

*Teter,* the Tenth Circuit laid out four factors for courts to consider when reviewing whether a

claimant's failure to undertake treatment will preclude the recovery of disability benefits.  First,

the treatment at issue should be expected to restore the claimant's ability to work.  Second, the

treatment must have been prescribed.  Third, the treatment must have been refused.  And finally,

the refusal must have been without justifiable excuse.

Essentially, Mr. Scott alleges that the ALJ based his disability determination on the

theory that had Mr. Scott complied with the prescribed regiment of treatment and medications, he

would be able to work.  But the ALJ did not base his disability determination or denial of

benefits on Mr. Scott's compliance with treatments so an analysis of the *Teter* factors was

unnecessary.

The Tenth Circuit utilized the *Teter* factors in *Frey v. Bowen*.[37]  In *Frey*, the ALJ relied

---

[36] 775 F.2d 1104, 1107 (10th Cir. 1985).

[37] 816 F.2d 508 (10th Cir. 1987).

on the claimant's failure to take pain medication as a basis for denial of benefits.[38]  The ALJ had

rejected the plaintiff's complaints of disabling pain, relying heavily on the plaintiff's failure to

take pain medication.  The ALJ concluded that had the plaintiff followed the prescribed regiment

of medication and treatment, the plaintiff probably would have been able to recover and return to

work.  The Tenth Circuit found the ALJ's failure to properly evaluate the *Teter* factors to be

erroneous.[39]  Specifically, the court found no pain medications had been prescribed.

But in *Qualls v. Apfel*,[40] the Tenth Circuit found the *Teter* factors to be inapplicable.  In

*Qualls*, the ALJ used the petitioner's failure to take medications in his credibility determination,

but not as a separate basis for denying benefits for failure to follow prescribed treatment.  In

other words, the ALJ only considered the medication use to assess "what attempts plaintiff made

to relieve his pain — including whether he took pain medication — in an effort to evaluate the

veracity of plaintiff's contention that his pain was so severe as to be disabling."[41]

Similarly, in this case, the ALJ did not base his residual functional capacity evaluation or

his denial of benefits on Mr. Scott's failure to take medications.  Instead, the ALJ only

considered Mr. Scott's failure to take methadone insofar as it related to his credibility.  And the

Tenth Circuit has specifically enumerated that the levels of medication used by the claimant and

the extensiveness of the claimant's attempts to obtain relief are factors to be considered when

---

[38] *Id.* at 517.

[39] *Id.*

[40] 206 F.3d 1368 (10th Cir. 2000).

[41] *Id.* at 1372.

assessing credibility.[42]  Because of this, *Frey* and *Teter* are inapplicable and the ALJ committed

no legal error by not addressing the *Teter* factors.

## CONCLUSION

In sum, the court finds substantial evidence in the record to support the ALJ's final ruling

and affirms the ruling as legally correct.  Accordingly, the court upholds the Commissioner's

decision denying disability insurance and social security insurance benefits to Mr. Scott, and

denies Mr. Scott's request to reverse the decision or remand the case.  The Clerk of the Court is

directed to close the case.

DATED this 17th day of July, 2007.

BY THE COURT:

Paul G. Cassell
United States District Judge

---

[42] *Huston*, 838 F.2d at 1132.